AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Meta Platforms, Inc. )
1601 Willow Road )
Menlo Park, California 94025 )

Case No.   '22  MJ2831

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the     Northern     District of     California     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960, 963 | Importation of controlled substances and conspiracy |
| 18 U.S.C. § 1001 | False statement |

The application is based on these facts:

See Attached Affidavit of H.S.I. Special Agent Mark Jay, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MARK W JAY   <small>Digitally signed by MARK W JAY Date: 2022.08.10 19:31:44 -07'00'</small>

*Applicant's signature*

HSI Special Agent Mark Jay

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

    telephone     *(specify reliable electronic means)*

Date:     08/11/2022

*Judge's signature*

City and state:  San Diego, California            Hon. Karen S. Crawford, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with the following Meta Platforms, Inc. accounts:

- Facebook account associated with https://m.facebook.com/miguel.barajasparra?_rdr (**subject account 1**); and

- Facebook account associated with Facebook ID #100001340378514, URL: https://es-es.facebook.com/people/Miguel-Antonio-Barajas (**subject account 2)**

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, 1601 Willow Road, Menlo Park, California 94025

## **ATTACHMENT B**

### I.        **Service of Warrant**

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.       **Items Subject to Seizure**

All subscriber and/or user information; all electronic mail; chat history; images; videos; text messages; histories; activity logs and all other documentation showing the user's posts and other account activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; information about the user's access and use of account applications; method of payment; detailed billing records; access logs; transactional data; and any other files associated with the following accounts:

- Facebook account associated with https://m.facebook.com/miguel.barajasparra?_rdr (subject account 1); and
- Facebook account associated with Facebook ID #100001340378514, URL: https://es-es.facebook.com/people/Miguel-Antonio-Barajas (subject account 2)

**III.**    The search of the data supplied by Meta Platforms pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited in time from **November 1, 2021, to August 10, 2022** and be further limited to:

The items to be seized shall be limited to:

    a.  Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to discuss, establish, or further drug trafficking or conspiracies to commit the same;

    b.  Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to identify Miguel Barajas Parra, and any co-conspirators involved in the activities in III(a);

    c.  Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

    d.  All photos and videos tending to establish or further drug trafficking or conspiracies to commit the same, identifying potential co-conspirators, or providing context to any relevant communications, records, photos, or videos or received or sent in temporal proximity to any relevant electronic mail;

    e.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts; and

    f.  Evidence of false statements to federal agents.

**Which is evidence of violations of Title 21, United States Code, Sections 952, 960, and 963; and Title 18, United States Code, § 1001**

## **AFFIDAVIT**

I, Special Agent Mark Jay, being duly sworn, hereby state as follows:

### **INTRODUCTION**

1. This affidavit is in support of an application by the United States of America for a search warrant for Internet Service Provider Meta Platforms, Inc., to search for records and data in and related to the following electronic communication and social networking accounts (the "**subject accounts**") (as described in Attachment A):

    a. Facebook account associated with https://m.facebook.com/miguel.barajasparra?_rdr (**subject account 1**); and

    b. Facebook account associated with Facebook ID #100001340378514, URL: https://es-es.facebook.com/people/Miguel-Antonio-Barajas (**subject account 2**)

2. As more fully described herein, there is probable cause to believe that within the **subject accounts** will be found evidence of violations of federal law, namely violations of Title 18 United States Code, Section 1001 (false statements), and Title 21, United States Code, Sections 952, 960, and 963 (importation of controlled substances and conspiracy) as further described in Attachment B.  The requested warrant relates to the investigation and prosecution of Miguel Barajas Parra ("Defendant") for importing approximately 2.3 kilograms (5.07 pounds) of heroin from Mexico into the United States.  As detailed below, on June 9, 2022, a grand jury in the Southern District of California returned a superseding indictment charging Barajas with conspiring to import 1 kilogram and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 952, 960, and 963 (Count 1), and importing 1 kilogram and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 952 and 960 (Count 2) (22cr0886-JLS). The investigation into the drug smuggling and whether Barajas made a false statement to federal officials in violation of 18 U.S.C. § 1001 is ongoing.

3.     The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **subject accounts**, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

## BACKGROUND

4.     I have been employed as a Special Agent with Homeland Security Investigations (HSI) since February of 2011. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.  Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

6.     I am aware that it is common practice for narcotics traffickers to work in concert utilizing various communications platforms, including social media like Facebook.  A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry.  With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding

arrangements and preparation for the narcotics importation.  When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity.  When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States. Moreover, in the event that drugs are seized by U.S. authorities at the ports of entry, it is common for narcotics traffickers to communicate about the seizure. These communications may occur weeks and months after the seizure and may include (i) discussion of the details of the seizure, (ii) discussions in which the courier provides proof that the narcotics were in fact seized (rather than stolen by the courier), and (iii) discussion of debt owed by the courier as a result of losing a load of narcotics, including efforts by narcotics traffickers to recover the value of the seized narcotics. Drug smugglers also post "trophy" photographs of their criminal activity, displaying images of smuggled drugs and drug proceeds as a way to boast of their exploits. Facebook allows its users to post such photos privately. Searches of social media like Facebook used by individuals involved in the importation of narcotics may yield evidence:

a.     tending to indicate efforts to import controlled substances from Mexico into the United States;

b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

d.     tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

7.   On or about January 20, 2022, at approximately 6:50 a.m., Miguel Barajas Parra, a United States citizen, entered the United States from Mexico, at the San Ysidro, California, Port of Entry, as the rider, registered owner, and sole occupant of a 2009 Yamaha YZF-R6 motorcycle bearing California license plate 21M5878.

8.   Barajas approached the inspection booth in lane 13 and used his mobile phone to show a Customs and Border Protection Officer (CBPO) a picture of his U.S. passport. Barajas stated that he had nothing to declare and that he was going to Palomar, San Diego.

9.   The CBPO at primary received a computer-generated alert on the motorcycle indicating that it was possibly being used to smuggle narcotics.  Based on the alert, the CBPO referred Barajas to secondary for further inspection.

10.   Further inspection resulted in the discovery of 3 packages concealed in the air vent compartment of the motorcycle, with a total approximate weight of 2.3 kilograms (5.07 pounds). A sample of the substance contained within the packages field tested positive for the characteristics of heroin. Lab analysis later confirmed that the substance contained heroin.

11.   At about 10:50 a.m, I advised Barajas of his Miranda rights. Barajas stated that he understood his rights, and he agreed to be interviewed.

12.   Barajas said that he worked as a plumber for a man in San Diego named Agustin.  Barajas said that he went to his boss's house to work, but Barajas said that he did not have the address or a phone number for his boss. Barajas said that he communicated with his boss by Facebook Messenger. During the interview, Barajas consented to the search of his mobile telephone, and he showed me the Facebook app on his mobile phone that showed the contact for "Porron" that Barajas claimed belonged to Agustin. In reviewing the Facebook Messenger content on Barajas's mobile phone,

I noted that the last conversation between Barajas and Porron was a conversation on January 17, 2022 (three days prior to the interview). During this conversation, Porron asked Barajas to bring him some pills. The conversation chain only went back to January 13, 2022, but during that time frame there was no mention of work or plumbing.

13. Barajas also claimed that he smuggled the heroin under duress. Barajas said that about two weeks prior, he met a "girl" on Facebook and began communicating with her through Facebook Messenger. The woman said that she wanted to come by his house to watch Netflix and eat pizza. Barajas said that he invited her to his house in Tijuana, Mexico, and sent his address via Facebook Messenger (he said, "I wanted to fuck her."). Once the woman was at his house, she made a phone call (to order pizza, Barajas thought). Thereafter, three men came to his house, threatened him with a gun, and told him they wanted him to "cross shit." Barajas said he already had a job, and one of the men put the gun in Barajas's mouth and said, "Either you want to work, or you're fucked right here." Barajas could not specify the date of these events. During the interview, Barajas said he didn't want to die, so he agreed to work for the men. Barajas said that he reported the incident to the Tijuana police the same day and that they "supposedly" made a report. About an hour after the police left, the smugglers called Barajas on the telephone they had given him and said, "Son of a fucking bitch, what are you calling the police for, what the fuck? Do it again and we're going to kill you and all your family." During the interview, Barajas was asked if the Facebook Messenger conversation between him and the woman setting up the Netflix/pizza date was saved, and he said that he deleted that conversation because his wife goes through his phone.

14. On April 20, 2022, a grand jury in the Southern District of California returned a single-count indictment charging Barajas with conspiring to import 1 kilogram and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 952, 960. (22cr0886-JLS). On June 9, 2022, a grand jury in the Southern District of California returned a superseding indictment charging Barajas with conspiring to import 1 kilogram and more of a mixture and substance

containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 952, 960, and 963 (Count 1), and importing 1 kilogram and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 952 and 960.

15.     On April 28, 2022, U.S. Magistrate Judge Karen S. Crawford issued a warrant authorizing the search of the phone that Barajas possessed when he smuggled the heroin into the United States on January 20, 2022 (22MJ1532). A review of Barajas's telephone pursuant to the warrant showed that he received a WhatsApp text message on January 20, 2022, at 7:27 a.m. (when Barajas would have been in CBP custody due to the smuggling event) stating, "What's going on?" Based on my training and experience, short messages from unknown callers with no context are often indicative of drug smuggling coordinators attempting to reach the drug mule to find out whether or not they have successfully crossed the border and where they are.  The fact that there is no context or prior content may indicate that the rest of the conversation had been deleted before the courier arrived at the port of entry. And though Barajas gave consent his phone on January 20, 2022, when he was arrested (para. 12), the forensic tool used to extract data from Barajas's mobile phone pursuant to his consent was not able to extract significant data from the Facebook app on Barajas's phone.

16.     Identification of the **subject accounts**: I identified the **subject accounts** through an open-source query. I concluded that the **subject accounts** are controlled by Barajas because (i) his name is associated with both accounts, and (ii) both accounts feature photographs of Barajas, whom I recognize based on my interview and arrest of him on January 20, 2022.

17.     There is probable cause to conclude that Barajas conspired to smuggle narcotics into the United States, smuggled narcotics into the United States, and made materially false statements to U.S. officials and that evidence of these crimes will be found in the **subject accounts**. Barajas admitted that he smuggled drugs into the United States (although he claimed duress). He also told the CBPO at primary that he had nothing to declare, although he knew his motorcycle was loaded with narcotics.

Moreover, there is probable cause to conclude that Barajas's statements to agents during his interview on January 20, 2022, were false. When asked to show the Facebook Messenger conversation between Barajas and the woman who summoned the criminals to his house, Barajas claimed that he deleted it so his wife wouldn't see the conversation. But I have seen no evidence that Barajas told his wife that her life was threatened by drug smugglers who were coercing Barajas to smuggle drugs. In order to credit Barajas's account, one would have to conclude that it was more important for him to hide his (unsuccessful) infidelity from his wife than to inform her that her life was at risk. Rather, it is probable that Barajas fabricated his story about the woman he met on Facebook and her conspirators who threatened Barajas. Similarly, Barajas claimed to be employed by a plumber named Agustin/Porron, but Barajas did not know the address where he supposedly reported to work and did not know his telephone number. Barajas claimed to communicate with his boss on Facebook Messenger. There is probable cause to conclude that the existence or non-existence of communications with the woman and the boss will be found in the **subject accounts**. Moreover, Barajas uses Facebook Messenger to communicate. The Facebook app was on his phone when he was arrested, and there was a recent message in which Porron asked Barajas to bring pills. Based on my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that the **subject accounts** contain telephone numbers, contact names, email addresses, appointment dates, messages, pictures and other digital information. In light of the above facts and my experience and training, there is probable cause to believe that Barajas was using the **subject accounts** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. In the event that drugs are seized at the border (as in this case), drug smugglers commonly communicate about the seizure for weeks or months thereafter, including to verify that

the drugs were actually seized (and not stolen) and to determine who is liable for the loss. Accordingly, I request permission to search the **subject accounts** for data beginning on November 1, 2021, up to and including August 10, 2022.

## BACKGROUND REGARDING META PLATFORMS

18.     Meta Platforms, Inc. a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. owns and operates free-access social networking websites Facebook that can be accessed at http://www.facebook.com.

### Background Regarding Facebook

19.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

20.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

21.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create

"lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

22.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

23.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that has that user tagged in them.

24.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat

communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

25.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

26.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

27.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

28.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

29.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

30.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

31.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

32.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

33.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

34.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

35.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the

user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

37. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta Platforms are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Meta Platforms for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta Platforms. The impact on Meta Platforms' business would be disruptive and severe.

38. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta Platforms, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, HSI seeks authorization to allow Meta Platforms to make a digital copy of the entire contents of the account(s) subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

39. Analyzing the data to be provided by Meta Platforms may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of

which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text.  Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.     The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

40.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

41.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

42.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

43.     The review of the subject accounts shall be limited in time from **November 1, 2021, to the present**. This time range is supported by the facts of this case. As noted in paragraph 14, Barajas was not able to specify a date when he was confronted by the men who purportedly coerced him into smuggling drugs, though he indicated that the events began when he met a woman on Facebook about two weeks before his January 20, 2022 arrest. In addition, Barajas claimed that he communicated with his boss over Facebook Messenger.  As noted in paragraph 6, in my experience, it is common for drug traffickers to discuss smuggling events – and seizures of narcotics – weeks and months after the event.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

44.     Other than as described above, the United States has not attempted to obtain this data by other means.

//

//

//

//

//

//

//

//

//

**CONCLUSION**

45.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **subject accounts** will yield evidence of Defendant's violations of Title 18, United States Code, Section 1001; and Title 21, United States Code, Sections 952, 960 and 963. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the accounts described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

MARK W JAY Digitally signed by MARK W JAY
Date: 2022.08.10 19:22:32 -07'00'
_____
Special Agent Mark Jay
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 11th day of August, 2022.

_____
Honorable Karen S. Crawford
United States Magistrate Judge

## ATTACHMENT A

This warrant applies to information associated with the following Meta Platforms, Inc. accounts:

- Facebook account associated with https://m.facebook.com/miguel.barajasparra?_rdr (**subject account 1**); and

- Facebook account associated with Facebook ID #100001340378514, URL: https://es-es.facebook.com/people/Miguel-Antonio-Barajas (**subject account 2**)

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, 1601 Willow Road, Menlo Park, California 94025

## ATTACHMENT B

## I.    Service of Warrant

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.    Items Subject to Seizure

All subscriber and/or user information; all electronic mail; chat history; images; videos; text messages; histories; activity logs and all other documentation showing the user's posts and other account activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; information about the user's access and use of account applications; method of payment; detailed billing records; access logs; transactional data; and any other files associated with the following accounts:

- Facebook account associated with https://m.facebook.com/miguel.barajasparra?_rdr (subject account 1); and
- Facebook account associated with Facebook ID #100001340378514, URL: https://es-es.facebook.com/people/Miguel-Antonio-Barajas (subject account 2)

**III.**    The search of the data supplied by Meta Platforms pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited in time from **November 1, 2021, to August 10, 2022** and be further limited to:

The items to be seized shall be limited to:

   a. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to discuss, establish, or further drug trafficking or conspiracies to commit the same;

   b. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to identify Miguel Barajas Parra, and any co-conspirators involved in the activities in III(a);

   c. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

   d. All photos and videos tending to establish or further drug trafficking or conspiracies to commit the same, identifying potential co-conspirators, or providing context to any relevant communications, records, photos, or videos or received or sent in temporal proximity to any relevant electronic mail;

   e. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts; and

   f. Evidence of false statements to federal agents.

**Which is evidence of violations of Title 21, United States Code, Sections 952, 960, and 963; and Title 18, United States Code, § 1001**